SECOND DIVISION

March 23, 1999

No. 1-97-1405

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )

)

DANTE BROWN, ) Honorable 

) Edward Fiala,

Defendant-Appellant. ) Judge Presiding.

JUSTICE McNULTY delivered the opinion of the court:

     After a jury trial, defendant Dante Brown was found guilty of first degree murder and attempted murder and sentenced to concurrent terms of imprisonment of 50 years for murder and 10 years for attempted murder.  Defendant claims on appeal that: (1) the statements of certain witnesses were improperly admitted under section 115-10.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.2 (West 1996)); (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the trial court erred in denying his motion 
in limine 
to bar evidence of prior bad acts and defendant's gang affiliation; and (4) the prosecutor made improper comments in closing argument that denied defendant a fair trial.  We reverse defendant's convictions.

Sandra Pittman, the widow of the victim, Gary Pittman, testified that in 1992 she and the victim moved to the Englewood neighborhood around 57th and Paulina in Chicago.  The victim’s mother lived next door to them and Jarvis McNeal lived on the other side of the victim’s mother.  On July 8, 1993, Sandra and the victim were at home when the victim told Sandra that he was going to his mother’s house to see if she needed anything.  Sandra watched from the window as the victim walked toward his mother’s house on Paulina Avenue.  Sandra turned from the window and entered the bathroom.  She then heard gunshots.  She returned to the window and heard someone say that the victim had been shot.

Sandra ran out to the street and over to a fence and grabbed the victim from a man who had been comforting him, and the victim fell to the ground.  Sandra cradled the victim and he kept repeating that he had been shot and she should call an ambulance.  Then the victim said "I love," closed his eyes, and died.

 Sandra testified that when she returned home later that night, she learned that Jarvis McNeal had been shot in the foot during the same incident.  Sandra did not see McNeal until two weeks after the victim’s murder when she met him on the street.   She asked him who killed her husband and he replied “Peewee.”  Sandra saw McNeal several more times during 1993 and she repeatedly asked him to go to the police and tell them what he knew about the shooting.  Sandra testified that she was not familiar with anyone in the neighborhood named Peewee.  

Sandra testified that on January 4, 1994, McNeal came to her apartment to see the train set she had gotten for her son.  She asked McNeal if he had gone to the police and told them about Peewee.  When he said that he had not, she asked him if he would now be willing to give the police this information and McNeal said that he would.  McNeal told Sandra that Peewee was Dante Brown.  McNeal also told her he had not gone to the police because "he was scared that the Black P-Stones would kill him."  McNeal told her that he had run into the gangway next to Sandra’s mother-in-law’s house when the shooting began.  Sandra then called the police and spoke with Detective Winstead and told him that McNeal was at her apartment and was willing to tell them who shot the victim.  By the time Detective Winstead arrived at Sandra’s home, McNeal had already left, saying that he would be next door, at his grandmother’s house.   

Sandra testified that she had spoken to the police prior to January 4, saying that she would call and tell them if McNeal gave her any information.  Sandra testified that the morning after the murder, several kids were picking up 9 millimeter and .38-caliber shell casings from near the victim’s mother’s house.  Sandra testified that she did not give these to the police because she thought they had collected enough evidence the previous night.  Sandra identified several tattoos on her husband’s body from autopsy photos.

Officer Leroy Horton testified that when he and his partner arrived at the crime scene, soon after the shooting, 40 to 60 people were at the scene.  McNeal, who was hopping around, had blood coming from his foot and said that he had been shot, met Officer Horton.  The victim was lying on the sidewalk with a gunshot wound to the chest.  Officer Horton said that there had been a lot of gang activity in the area, with the Gangster Disciples and Black P-Stones being the most active.  He testified that these two gangs were at war with each other in July 1993.  Officer Horton asked McNeal if he knew who shot him and McNeal said that it was Peewee, a P-Stone from 57th and Winchester.   McNeal told the officer that he had been standing on the corner with the victim when he noticed a blue or black, dark-colored Ford Tempo or Taurus coming eastbound on 57th Street.  As the car reached the corner of 57th and Paulina, the occupants began to shoot.  Peewee leaned out of the car and started shooting. The victim was hit and fell to the ground.  McNeal was fleeing up the gangway when he was struck.  The car went southbound on Paulina.   

Detective Robert Girardi testified that after talking to several people in the area of the shooting, he learned that nobody had seen who the shooter was.  Detective Girardi learned that the car from which the shots were fired did not have any plates and only one working headlight.

Detective Girardi arrived at Holy Cross Hospital shortly after 2 a.m. on July 9.  He learned from the doctor that McNeal had been shot once in the right foot.  He spoke with McNeal, whose foot was bandaged and who was awaiting release in the treatment area of the emergency room.  McNeal told the detectives that he and the victim had come out of McNeal’s house and were walking over to the victim’s mother’s house at 57th and Paulina.  When they reached the corner, McNeal saw a dark-colored car traveling on 57th Street.  The car slowed as it approached the corner and then gunfire erupted from the car.  As the car turned southbound on Paulina, the gunfire was now coming from both the front and back passenger windows.  McNeal ran for a gangway but was hit in the foot.  He did not see any gang signals or slogans.  McNeal told the detectives that he could not be sure who the shooter was, but he had an idea of whom he might be because of an incident earlier that night when a person he knew as Peewee had been driving around the neighborhood in a different car and shooting people.  McNeal told the officer that he was a Gangster Disciple and that Peewee was a Black P-Stone and that the two gangs were enemies in July 1993.

Detective Girardi and his partner returned to the scene to see if they could locate any witnesses or find out Peewee’s real name, but they were unsuccessful.  Two or three weeks after the murder Detective Girardi spoke with Sandra Pittman on the phone, and she told him that McNeal had told her that Peewee shot the victim.  Detective Girardi testified that he made several attempts to located McNeal and a person named Peewee but was unsuccessful.  

Detective Edward Winstead testified that he spoke with Sandra Pittman on the telephone on January 4, 1994.  She said that her husband had been shot and killed the previous July and that she had an eyewitness to the murder.  Detective Winstead pulled the file and quickly familiarized himself with the facts.  When he arrived at Sandra’s home, McNeal had already left.  Detective Winstead went to McNeal grandmother’s house but was told McNeal had left.  He left his card and told the grandmother to have McNeal contact him when he returned.  Detective Winstead never heard from McNeal.  Detective Winstead stopped by McNeal’s grandmother’s house again and learned that McNeal was afraid and changed his mind about coming forward.  The detective checked for McNeal at his father’s home and at his school, but was unable to locate him.      

On March 4, 1995, after defendant was in custody, Detective Winstead went to McNeal’s grandmother’s house once more.  He told the grandmother that defendant was in custody and that the police needed McNeal’s help.  A few minutes later McNeal came out and said that he would cooperate.  McNeal said that he had been afraid to come forward, but since the police had defendant in custody, he would help the police.  

Detective Winstead testified that, at Area One, McNeal viewed a lineup and immediately identified defendant as the person he saw shooting from the rear passenger window and who shot him.  McNeal told Detective Winstead that, on the night of the shooting, he was standing with a small group of men on the corner of 57th and Paulina when the victim came out and started talking to some of the older men.  McNeal saw a dark-colored car, which he thought was a Ford, parked on 57th Street, facing east.  The car had only one headlight and some type of alarm.  There were people in the car but it did not move.  McNeal told the detective that, after a while, the car then came eastbound on 57th Street towards the group.  As the car approached, a gun came out of the front window and then a man with a gun stuck his head and arms out of the front window, and this man started firing at McNeal’s group.  McNeal ran toward a gangway but was hit in the foot.  The victim got hung up on the fence and was shot in the chest.  McNeal told the detective that he had never seen the car before.  He did not get a good look at the front passenger but he said that the shooter in the rear passenger seat was defendant, a person he has known for quite a while.  

McNeal told Detective Winstead that when he spoke with detectives after the shooting, he told them that Peewee had done it, but he later had second thoughts.  Since he had not been severely injured, he decided not to say anything and to get out of the neighborhood.  At one time McNeal heard that defendant was in custody so he returned to the neighborhood.  Soon after his return, he was near 57th and Ashland when a car containing defendant pulled up.  Defendant made a motion toward McNeal, which  was either a wave or a threat.  McNeal went into a store and stayed there until the car left.  

Assistant State’s Attorney Carrie Reynolds (ASA) testified that she took a written statement from McNeal on March 4, 1995.  She spoke with McNeal alone and ascertained that he had been treated well by the police and that he had not been threatened or promised anything in return for his statement.  In his statement, McNeal said that he was a Gangster Disciple and that the victim was not in a gang.  McNeal stated that on July 8, 1993, around 2:30 p.m., he was on a porch at 57th and Marshfield when a light blue Chevy, with defendant in the back seat, drove by.  Defendant called somebody in the street a name that was disrespectful to a Gangster Disciple.  McNeal said that defendant was a chief Black P-Stone.  The Black P-Stones were at war with the Gangster Disciples at the time, and the two gangs were always shooting at each other.  McNeal told her that the man on the street picked up a bottle and threw it at the Chevy, breaking the rear window.

      McNeal then told ASA Reynolds that at around 11 p.m. on July 8, 1993, he was on the corner of 57th and Paulina with the victim and two other men.  A dark blue Ford with one headlight parked at 57th and Wood and remained there for an hour.  The car began moving slowly eastbound on 57th Street and the front passenger began shooting at them.  McNeal then saw Peewee, who, he said, was defendant Dante Brown, lean out the rear passenger window and begin to shoot.  McNeal was hit in the right foot.  McNeal stated that he did not tell the police that defendant was the shooter because he was scared of the defendant and, because of this fear, he moved out of the neighborhood.

Detective James O’Brien testified that on August 31, 1994, he was speaking with Reggie Lyons regarding an unrelated case when Lyons asked the detective why the police had not yet locked up Peewee, whose name was Dante, for murdering an older man in a drive- by shooting the previous summer at 57th and Paulina.  Lyons said that he had been standing on the corner of 57th and Paulina with some other Gangster Disciples when a black Ford Tempo or Taurus, with one headlight, came eastbound on 57th Street.  The passenger- side occupants began shooting at Lyons' group.  The shooting continued as the car turned southbound onto Paulina.  Lyons told the detectives that he saw Peewee shooting.  He said that the older man on the corner was killed and McNeal was shot in the foot.  Upon checking the file, O’Brien learned that a person named Peewee, who was Dante Brown, had been named as the offender.  He made out a report and passed it along to Detectives Girardi and Kutz.  Once his caseload lightened in early 1995, O’Brien tried to locate defendant on his own but was unsuccessful.

Once defendant was in custody, O’Brien brought Lyons to Area One from the county jail to view a lineup.  Lyons identified defendant as one of the shooters.  Lyons gave a handwritten statement later that day.   O’Brien testified that he did not recall Lyons making any reference to a prior shooting that occurred earlier on July 8, 1993.

ASA Darren O’Brien took Reggie Lyons’ handwritten statement on March 8, 1995.  Lyons stated that he had been treated well by police and that he had not been threatened or promised anything in return for his statements.  Lyons said that he was a Gangster Disciple in July 8, 1993, and had known the victim, who was not in any gang, for one year.  He had known McNeal, also a Gangster Disciple, for 14 years.  Lyons stated that at around 11 p.m. on July 8, 1993, he, the victim, McNeal and other Gangster Disciples were standing on the corner on 57th and Paulina.  Someone in the group noticed a dark car with one headlight that had stopped on 57th near Hermitage or Wood.  The car then began approaching Lyons group.  Someone in the front seat, whom Lyons could not see, began shooting.  Lyons then saw defendant, known as Peewee, whom Lyons had known for five years, start shooting from the back seat.  Lyons stated that defendant was a Black P-Stone and the two gangs were enemies at the time.  Lyons ran down Paulina, onto which the car also turned.  He saw the victim fall and he also saw McNeal fall to the ground and heard him yell "ouch, my foot."  Defendant and the other shooter kept firing as the car turned onto Paulina.  Lyons said Peewee wanted to shoot them because, earlier that day, Lyons and some other Gangster Disciples were near 57th and Marshfield when, in defendant’s presence, some of the Gangster Disciples made a sign that was disrespectful of defendant's gang.  ASA O'Brien said that Lyons never mentioned an earlier shooting on July 8, 1993.

ASA Joseph Roddy presented Lyons' grand jury testimony.  He first stated that Lyons never indicated that he had been threatened or promised anything in return for his grand jury testimony.  Lyons told the grand jury that at 11 p.m. on July 8, 1993, he was at 57th and Paulina with a group of people that included McNeal, the victim, and Timmion Miller.  A dark blue or black car pulled up with about three people in it.  Lyons saw Peewee, whom Lyons had known for five years and whose real  name was Dante Brown, start shooting from the back seat.  A person who was in the front seat also began to shoot.  The victim and McNeal were hit.  Lyons then identified defendant’s picture.  

     Timmion Miller testified that on July 8, 1993, he was on the corner on 57th and Paulina along with McNeal and the victim.  He stated that he was a Gangster Disciple, along with McNeal and Lyons.  He stated that the victim was a Vice Lord.  A car rolled up and hit its alarm and then there was a hail of bullets.  The car was traveling east on 57th Street and the shooting started as the car neared Paulina.  He testified that the Gangster Disciples and Black P-Stones were enemies at the time.  Miller ran through the gangway and did not look at the car or the shooters in the car.  Miller said that defendant is a Black P-Stone and he has known him for a number of years.  Miller did not talk to police the night of the shooting and did not talk to police until March 9, 1995, when a friend of his, Arlander Jackson, who has since died, told the police where he could be found.   Miller remembered speaking to Detective Luke Daly at the station at 51st and Westworth.  He recalled telling Detective Daly that he was on the corner of 57th and Paulina on July 8 with the victim and McNeal.  He did not remember telling Detective Daly that a car, which he believed was a two-door Chevy, came eastbound on 57th Street, slowed down and turned on some type of alarm.  Nor did he recall saying that the car then gathered speed and that he saw a person known as Peewee sitting in the front seat, which was pulled all the way back, with a gun sticking out of the window.  He did not recall telling Detective Daly that as the car went by Peewee started shooting at the group, nor did he recall saying that another person in the car, seated in the back seat, also started shooting.

Miller remembered telling Detective Daly that he ran south on Paulina and then cut west into a gangway, but he could not recall telling him that the car went south on Paulina and then west on 58th Street.  He remembered saying that he had known Peewee since 1989.  He remembered viewing a lineup on March 9, 1995, and he said that the police had told him to go in and pick out number three, so he did.  While viewing a picture of the lineup as he testified, Miller said that he did not recognize anyone in it, although the second person from the left "pretty much looks like Peewee."  

Miller recalled speaking with ASA Maureen McGee on March 9, 1995, and telling her that he was a Gangster Disciple.  He remembers telling her that he was with  McNeal, Lyons, and the victim on July 8, 1993, at the corner of 57th and Paulina, but he did not remember telling her that they were all Gangster Disciples except for the victim, who was not in any gang.  He did not recall telling her that a dark gray two-door Chevy drove up, came to a complete stop, hit the car alarm and then started to drive toward his group.  He did not remember saying that Peewee was firing from the passenger side of the car, and he did not tell her that Peewee was Dante Brown.  

Miller testified that the police did not treat him as a citizen on March 9, 1995.  Rather, he said that he was treated as “no human being.”  He testified that he told ASA McGee that he was well treated by the police “because if I didn’t, they was going to put a drug case on me, plus a gun case.  So, I complied with them people.”  While he admitted that he signed the statement he did not remember if he read and corrected it.  He recognized his signature on each page of the statement, but questioned his initials on a correction on the second page.  

Miller acknowledged that on the afternoon of August 21, 1996, he went to defendant’s lawyer’s officer and gave a statement.  When asked how he got to the lawyer’s officer, Miller answered, “Ladies and gentleman of the jury, I volunteered to help Peewee of his innocence because I did not see him shoot nor kill Gary Pittman. I’m a hundred per cent sure that he did not shoot and kill Gary Pittman on July 8, 1993.”  He stated that defendant and defendant’s cousin, Phil, drove him to and from the lawyer’s office.  They did not tell him on the way there what questions he would be asked and they waited in the reception area while he gave the statements.  He did not sign the statement he gave the lawyer because he “was in a rush to get away from downtown.”  He testified that he signed the statement he gave to ASA McGee because he was under "extreme pressure."   

Miller testified that he remembered speaking to ASA Ann Head on January 10, 1997.  At that time he was under subpoena and in custody because he failed to appear at an earlier court date in this case.  He remembered telling ASA Head that the reason he did not sign the statement he gave to defendant's lawyer was because it was false and that he signed the statement he gave to ASA McGee because it was true.  He did not remember telling ASA Head that he was afraid to come to court because of what the Black P-Stones would do to him.  He did remember telling her that he did not come to court in October of 1996 because around that time the Black P-

Stones street gang had shot at him and because defendant was out on bond in October 1996.   Miller testified that he went to Minnesota because he was afraid of the Black P-Stones if he testified against defendant.  Miller admitted that he did not want to be in court.  He stated that he is no longer afraid of the defendant or the Black P-Stones.

Detective Luke Daly testified that he spoke with Timmion Miller on March 9, 1995, at the 5500 block of south Marshfield.  Miller agreed to go to Area One police headquarters.  When asked about the victim's death, Miller told Detective Daly that he was on the corner of 57th and Paulina on July 8, 1993, with several people, including the victim and McNeal.  Miller told him that he saw a vehicle drive down 57th Street rather slowly.  The car's alarm went off and it gathered speed and came toward the group.  Dante Brown then leaned out the window and began shooting.  

Detective Daly testified that Miller viewed a lineup and identified defendant, who was in the second position, as the shooter.  Detective Daly testified that he never told Miller to pick the third person in the lineup and he had no reason to do so as that person was not involved in the case.  Detective Daly testified that Miller was not forced to sign his statement and no pressure was exerted on him in return for his statement.

ASA Maureen McGee testified that she took Timmion Miller's handwritten statement on March 9, 1995.  She spoke with Miller alone and he never said that the police had executed extreme pressure on him.  Miller said that he had been treated well by the police.  Miller signed each page of the statement and initialed all changes.  In his statement Miller said that he was a Gangster Disciple.  He also said that on July 8 1993, he was on the corner of 57th and Paulina with McNeal, Lyons, and the victim.  All were Gangster Disciples except the victim, who did not belong to any gang.  Miller saw a dark gray Chevy drive up and come to a stop.  The car's alarm went off and it started to move toward the group.  He saw Peewee, whose named he believed to be Dante Brown, shooting from the passenger side of the car.  Miller stated that he was treated well by the ASA and the police and that he had not been promised anything in return for his statement.

ASA Head testified that on January 10, 1997, Miller told her that he did not want to testify in this case.  Miller told her that two days before an October court date in this case, he was walking down the street when a car drove by and fired shots at him.  Miller told ASA Head that he viewed the lineup and identified defendant as one of the shooters and that defendant shot the victim.  He did not say that the police told him whom to identify in the lineup.  Miller told her that he was reluctant to testify because he feared the Black P-Stones would do something to him.  He told her that the police did not pressure him into giving his statement and when he looked at his statement he recognized his signature because of how he writes his T's.  He said that he did not sign the statement he gave defendant's attorney because it was a lie.  He signed the one he gave to ASA McGee because it was the truth.  

ASA Head testified that on January 16, 1997, she again spoke with Miller.  Miller's attorney was present at that time.  Miller told ASA Head that defendant had called him one day and told him that he would pick him up and bring him to defense counsel's office.  While driving there, defendant told Miller the questions that would be asked of him.  

John Bloore testified that on March 3, 1995, he placed defendant under arrest for the victim's murder.  It was stipulated that John Bloore was an expert in the field of gangs.  Bloore testified that in the summer of 1993, the Gangster Disciples and the Black P-Stones were at war with each other over the narcotics trade around 57th and Paulina and Marshfield.  When gangs are at war they commit everything from property damage to homicide.  Bloore stated that defendant is a Black P-Stone and that he had  the rank of a lawman.  A lawman is one who carries out the law of the gang, such as shootings or beatings.  Bloore identified several of defendant's tattoos as evidence that he belongs to the Black P-

Stone.  Bloore did not believe that the victim belonged to any gang.

Dhyana Fernandez, a private investigator, testified for the defense.  She testified that on August 29, 1996, she met with Reggie Lyons at the Hill Correctional Center in Galesburg.  Lyons agreed to speak with her and she asked him about the victim's murder.  Lyons told her that while he was on the corner that night he heard shots and then ran.  He said that he was not able to identify anyone who fired shots that night.  Lyons told her that he lied to the police when he said he saw the shooter because he was facing unrelated charges and was under the impression he would get help on his case if he identified the shooter here.   Lyons signed an affidavit, stating that he was on the northwest corner of 57th and Paulina when an eastbound car on 57th Street slowed at Paulina.  One of the passengers began shooting and Lyons ran.  Lyons stated in his affidavit that he was not contacted about this case until 1995 when he was in Cook County jail awaiting trial on an unrelated charge.  Some homicide officers contacted him and influenced him to point out defendant as the shooter.  Lyons never actually saw the shooter but did as the police asked because they said by doing so he would help himself out on his case.  Lyons said that it did not help him on his case.

Kenneth Madock, an official court reporter, testified that he transcribed McNeal's testimony at a pretrial hearing.   Madock recorded McNeal's response as "Uh-uh" when he was asked if he saw defendant shoot the victim.

McNeal and Lyons did not testify at trial.  Each asserted his fifth amendment privilege not to incriminate himself.  The trial court found that they did not have  valid concerns of self-

incrimination and ordered them to testify.  The trial court held McNeal and Lyons in contempt for refusing to testify.          At the conclusion of this evidence, the jury found defendant guilty of first degree murder and attempted murder and defendant was sentenced to concurrent terms of imprisonment of 50 years for murder and 10 years for attempted murder.                 

Defendant claims on appeal that McNeal's and Lyons’ statements were improperly admitted under section 115-10.2 of the Code of Criminal Procedure.  725 ILCS 5/115-10.2 (West 1996).   Defendant claims that this residual hearsay statute was unconstitutionally applied because the application of the statute violated the 
ex post facto 
clause of the state and federal constitutions, Lyons' and McNeal's statements lacked the requisite guarantees of trustworthiness required by the statute and the confrontation clause, and McNeal was improperly found unavailable to testify.         For the purposes of this appeal, we will address defendant's contentions that Lyons' and McNeal's statements were improperly admitted because they lacked the requisite particularized guarantees of trustworthiness and that McNeal’s statements were improperly admitted because McNeal was erroneously found unavailable to testify.   In order for hearsay to be admissible under section 115-10.2, the hearsay statement must fulfill six requirements: (1) trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; (5) the declarant's unavailability as a witness; and (6) notice.  725 ILCS 5/115-10.2 (West 1996).   

In assessing the trustworthiness of a hearsay statement, courts consider whether: (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant’s interest; and (4) there was an adequate opportunity to cross-examine the declarant.   
Chambers v. Mississippi, 
410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973).  The existence of all four factors is not required for a statement to be admitted, but there must be other considerable assurances of the statement's trustworthiness.  
People v. Carson, 
238 Ill. App. 3d 457, 606 N.E.2d 363 (1992).  Incriminating statements that are admissible under an exception to the rule against hearsay are inadmissible under the confrontation clause unless the State either produces the declarant for cross-

examination or demonstrates both that the declarant is unavailable and that the statement bears indicia of reliability.  
Idaho v. Wright, 
497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990).  The challenged evidence must be so trustworthy that adversarial testing would add little to its reliability.  
United States v. Canan, 
48 F.3d 954 (6th Cir. 1995).   It is for the trial court to determine, by the totality of the circumstances, whether it considers the hearsay statement to be trustworthy, and its determination will not be disturbed absent an abuse of discretion.  
Wright, 
497 U.S. at 820, 111 L. Ed. 2d at 655, 110 S. Ct. at 3149. 

Here, Lyons' statements are gravely lacking any indicia of reliability.  Lyons' statements were certainly not made spontaneously after the crime occurred.  Rather, Lyons' statements naming defendant as the shooter were made long after the incident. Lyons' first statement naming defendant was given on August 31, 1994, more than one year after the victim was shot.  This statement took place while Lyons was being questioned regarding an unrelated case.  Lyons' handwritten statement naming defendant was not taken until  March 8, 1995, and he did not testify before the grand jury until March 21, 1995.  

Furthermore, when Lyons testified before the grand jury on March 21, 1995,  this statement was not subject to meaningful cross-examination.  The United States Supreme Court has yet to decide whether grand jury testimony can be admitted under the residual hearsay exception, and the circuit courts of appeals are in conflict as to whether such evidence is admissible.  
United States v. Dent, 
984 F.2d 1453 (7th Cir. 1993)(the prior grand jury testimony did not have sufficient indicia of trustworthiness); 
United States v. Clarke, 
2 F.3d 81 (4th Cir. 1993)(grand jury testimony does bear sufficient indicia of reliability).  Like the seventh circuit in 
Dent, 
we find that Lyons' grand jury testimony did not bear sufficient indicia of trustworthiness.  It does not appear that Lyons was subjected to questioning while testifying before the grand jury that would completely eliminate the need for cross-examination at trial.  Under these circumstances, we find that Lyons' prior statements should not have been admitted at defendant’s trial.  

McNeal's statements likewise lacked sufficient indicia of trustworthiness.  While McNeal made his first statement implicating defendant shortly after the shooting, McNeal told the officer at the scene that he knew who shot him but would not say that he saw who shot him.  The following morning, while in the hospital, McNeal told the detectives that although he was not sure who shot him, he thought that it was defendant since, earlier on the day of the shooting, defendant had been driving around the neighborhood in a different car shooting people.  Nearly two years after the shooting, when McNeal gave a statement to the assistant State's Attorney, he did not mention that defendant was shooting at people earlier on the day that the victim was shot.  Rather, he described the events that occurred earlier on the day of the victim's shooting as defendant saying something disrespectful to a rival gang member on the street and the rival gang member throwing a bottle at the car in which defendant was riding.  These inconsistencies highlight the lack of trustworthiness in McNeal's statements, as well as the need to cross-examine McNeal in order to determine whether he had a reasonable basis for naming defendant as the shooter.  Under these circumstances, we find that McNeal's statements were improperly admitted under the residual hearsay rule.    

      Defendant also claims that the trial court erred in finding McNeal unavailable under section 115-10.2.  The privilege against self-incrimination is to be liberally construed in favor of the accused or the witness.  
Hoffman v. United States, 
341 U.S. 479, 95 L. Ed. 1118, 71 S. Ct. 814 (1951); 
People v. Newmark, 
312 Ill. 625, 144 N.E. 338 (1924).  A witness may be denied the privilege only when it is perfectly clear, from a careful consideration of all the evidence in the case, that the answers sought cannot possibly have a tendency to incriminate.  
People v. Cooper, 
202 Ill. App. 3d 336, 559 N.E.2d 942 (1990).  It is within the trial court's discretion to determine whether the witness has a valid basis for invoking his fifth amendment right against incrimination.  
People v. Redd, 
135 Ill. 2d 252, 553 N.E.2d 316 (1990).  Any uncertainty as to whether a question calls for an incriminating answer is to be resolved in favor of the witness.  
People v. McNeal, 
No. 97-1170 (December 2, 1998).    

Recently, in 
People v. McNeal, 
No. 97-1170, the appellate court addressed whether the trial court properly found that McNeal's invocation of his fifth amendment right and refusal to testify at defendant Dante Brown's trial were improper and contemptuous.  The court found that McNeal should have been allowed to invoke his fifth amendment privilege since he and defendant Dante Brown belonged to rival gangs and he and defendant had each been charged with gang- related murders that occurred within two or three blocks of each other.  Thus, any testimony by McNeal in defendant Brown’s trial about his gang membership, activities, or motivation could be used against McNeal in the murder case against him.  Moreover, testimony given by McNeal placing him in the area where the crime with which both he and Dante Brown were charged occurred could have provided incriminating evidence in McNeal's subsequent trial.  The court therefore could not say that it was perfectly clear that McNeal could not possibly have incriminated himself.  In conclusion, the McNeal court noted that the government could have offered McNeal immunity, thus making him available as a witness, but chose not to do so.

In reaching its decision, the court in 
McNeal 
found persuasive 
People v. Medrano, 
271 Ill. App. 3d 97, 648 N.E.2d 218 (1995), wherein the trial court allowed the complaining witness in a gang-

related murder case to invoke his fifth amendment privilege where the witness also had a gang-related murder charge pending against him.  The appellate court noted that the privilege extends not only to answers that would in themselves support a conviction but also to answers that might furnish a link in a chain of evidence needed to prosecute the witness for a crime.  The court thus held that, "[s]ince the pending murder trial against [the witness] involved a shooting where gang affiliation would be incriminating, forcing [the victim] to testify would have provided evidence for the prosecutor in the pending murder charge.  Therefore, the victim had a colorable fifth amendment privilege claim.”  
Medrano, 
271 Ill. App. 3d at 102.     The 
McNeal 
court's finding that McNeal properly invoked his fifth amendment privilege would not change the fact that McNeal was unavailable to testify against the defendant.  When a witness properly exercises his fifth amendment privilege, he is deemed unavailable to testify. 
United States v. Silverstein, 
732 F.2d 1338 (7th Cir. 1984); 
United States v. Johnson, 
904 F. Supp. 1303 (N.D. Ala. 1995).  However, although McNeal was unavailable to testify, as we have noted above, his statements were still inadmissible due to their lack of trustworthiness and the inability of the defense to subject them to cross-examination.           

We now turn to defendant’s claim that the State failed to prove him guilty beyond a reasonable doubt since the sole evidence against him is witness statements that have been contradicted or recanted.  In light of our determination that Lyons' and McNeal's statements were improperly admitted, we are left only with Miller's prior statements, which Miller disavowed at trial.  We thus consider whether these statements are sufficient to find defendant guilty beyond a reasonable doubt.    

When reviewing a challenge to the sufficiency of evidence, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Willer, 
281 Ill. App. 3d 939, 667 N.E.2d 708 (1996).  We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant’s guilt.  
People v. Collins, 
106 Ill. 2d 237, 478 N.E.2d 267 (1985).

The fact that a conviction is based primarily on recanted prior inconsistent statements does not as a matter of law mean that the conviction cannot be sustained.   
People v. Zizzo, 
301 Ill. App. 3d 481, 703 N.E.2d 546 (1998); 
People v. Curtis, 
296 Ill. App. 3d 991, 696 N.E.2d 372 (1998),  
People v. Arcos, 
282 Ill. App. 3d 870, 668 N.E.2d 1177 (1996).  The trier of fact must weigh the different statements and determine which is to be believed.  
Arcos, 
282 Ill. App. 3d at 875.  Where a jury or trial court has convicted a defendant on the basis of a recanted prior inconsistent statement, the question for the reviewing court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  
People v. Curtis, 
296 Ill. App. 3d 991, 696 N.E.2d 372 (1998).  

Recently, in 
Zizzo, 
the court noted that the witness gave two sworn accounts of defendant’s role in the alleged crime, both of which could not be true. The court held that the trier of fact weighed the inconsistent statements, after listening and watching the witness on the stand, and found that his prior testimony was more truthful.  The court found nothing in the record to justify the substitution of its judgment for that of the trial court with respect to the witness’ credibility.  The court found that this statement, taken together with the discovery of defendant's fingerprint at the crime scene, was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt.  
Zizzo, 
301 Ill. App. 3d 481. 

Similarly, in 
People v. Curtis, 
296 Ill. App. 3d 991, 696 N.E.2d 372 (1998), the court found that the trial court weighed the evidence and assessed the witness' testimony and properly could have found that defendant's prior inconsistent statement was more believable than his trial testimony.  The 
Curtis 
court stated that this prior statement, combined with other physical evidence linking defendant to the crime, was sufficient to find defendant guilty beyond a reasonable doubt. 

Where there is only a disavowed witness statement, however, and no other evidence against a defendant, courts have found the evidence insufficient to support a conviction.  In 
People v. Parker, 
234 Ill. App. 3d 273, 600 N.E.2d 529 (1992), the three eyewitnesses testified that the defendant had not participated in the crime, but their prior inconsistent statements said that he had participated.  The court reversed defendant’s conviction, finding that the witnesses gave explanations for giving untruthful testimony in their previous statements, indicating their unreliability.  This, combined with the complete lack of physical evidence, led the court to conclude that defendant had not been proven guilty beyond a reasonable doubt.  See also 
People v. Arcos, 
282 Ill. App. 3d 870, 668 N.E.2d 1177 (1996) (the court reversed defendant’s conviction since the witness disavowed earlier statement implicating defendant in the murder and there was no corroboration for the earlier statement);  
People v. Wise, 
205 Ill. App. 3d 1097, 563 N.E.2d 1057 (1990)(witness disavowed earlier statement that defendant had robbed him, and this combined with complete lack of corroborative evidence rendered the witness’ testimony insufficient to sustain the defendant’s conviction).

In the instant case, as in 
Parker, Arcos, 
and 
Wise, 
the only evidence linking defendant to the victim's murder is a disavowed witness statement.  Other than Miller's prior statements, which he recanted at trial, there was no evidence, physical or otherwise, indicating that defendant committed the crime.  Miller's first statement naming defendant as the shooter was not made until nearly two years after the crime occurred.  Miller claimed that, at the time he made the statement, he was afraid that the police were going to charge him with a drug offense.  Due to the particular circumstances of this case, where Miller's prior statements were not made contemporaneously with the victim's shooting and lacked corroborative evidence, we find that Miller's prior statements, alone, which were later disavowed, were insufficient to prove defendant guilty beyond a reasonable doubt. In light of our finding that the evidence is insufficient to find defendant guilty beyond a reasonable doubt, we must reverse defendant's conviction.  Our ruling makes it unnecessary to address the remaining issues raised by defendant.

Reversed. 

RAKOWSKI and COUSINS, JJ., concur.