2022 IL App (1st) 200433-U

No. 1-20-0433

Order filed October 13, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 15409 |
| | ) | |
| MARVIN SMITH, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence are affirmed where: (1) defendant was proved guilty beyond a reasonable doubt of armed robbery with a firearm, (2) any error in the admission of a witness's prior inconsistent statement was harmless where the same statement was properly admitted into evidence, and (3) defendant affirmatively acquiesced to the trial court's responses to jury questions and defendant cannot otherwise establish a claim of ineffective assistance of counsel.

¶ 2    Defendant Marvin Smith appeals his conviction for armed robbery with a firearm. On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt, a

witness's prior inconsistent statement was improperly admitted, and that the trial court erred in responding to a jury note indicating that the jury had maintained a split vote for several hours.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                              I. BACKGROUND

¶ 5    Defendant was charged by indictment with first degree murder, residential burglary, armed robbery with a firearm, and home invasion. The case stemmed from the shooting death of Dushawn Davis in his apartment, where multiple items were taken. Also charged as codefendants were Joshua Brown and Kamal Smith. Defendant's case was severed from the codefendants' cases. Prior to trial, the State opted to proceed solely on the first degree murder and armed robbery with a firearm charges.

¶ 6    At trial, Cleshawn Henry testified that she was the mother of the victim, Dushawn Davis. On April 24, 2011, Davis was living at 79th and South Greenwood Avenue in Chicago. Henry last saw Davis on April 23, 2011, and he was alive and healthy at that time. On April 24, 2011, which was Easter Sunday, Henry spoke to Davis during the day. Davis started to say some "weird stuff" at the end of the call, which made Henry not feel right. Henry decided to go over to Davis's apartment to check on him.

¶ 7    After gaining access to Davis's apartment, Henry found Davis laying in a fetal position with blood all over him and multiple gunshot wounds. Henry also noticed that cords were off the television and that Davis's laptop and PlayStation were gone. Henry testified that Joshua Brown was Davis's friend. Henry continued that she had seen Brown around a lot of times because Brown

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

and Davis went to the same school and church. On cross examination, Henry testified that she was unsure if she had ever seen Davis hang out with defendant or whether the two went to school together.

¶ 8    Daniel Woods testified that in April 2011 he was managing the property at 7939 South Dobson Avenue. Dobson Avenue was one street west of Greenwood Avenue. Dobson and Greenwood shared an alley. On April 24, 2011, in the early afternoon, Woods took out the garbage and was cleaning up around the dumpsters in the alley. Woods heard what he thought to be gunshots coming from the vestibule or courtyard of the apartment buildings on Greenwood.

¶ 9    About 20 to 25 seconds later, Woods saw two African American men running out of the courtyard and across the alley to a car that was parked on the Dobson side. Woods testified that each man wore a hoodie with the hood up. One was taller than the other and both had a slender build. Woods noted that each carried bags and that one of the men had what looked like a rifle case. The two individuals put everything in the car. One of the individuals then came toward Woods and pointed a gun in his direction. The individual was close enough that Woods could see that he was pointing a firearm at him but not close enough for Woods to see his face because he had his hood pulled up. Woods hid behind one of the dumpsters and the individual got into the car and the car proceeded down the alley.

¶ 10    Woods then called the police. The police eventually showed up and Woods noticed that the alley and area around the "building on Greenwood" was taped off. The building that was taped off was the same building that Woods had seen the two males run from. Woods then notated on People's Exhibit 3, a map of the area around the 7900 blocks of South Dobson and Greenwood

Avenues, to show where the two males ran from, where Woods lived, and where the waiting car was parked.

¶ 11    Chicago Police Sergeant Michael Scarriot testified that he was the evidence technician assigned to the scene at 7940 South Greenwood Avenue on April 24, 2011. Scarriot began processing the scene around 4:15 p.m. Several photographs were admitted of the scene, including the living room area where the victim was located. Scarriot also recovered numerous fingerprints, a pillow, and fired cartridges.

¶ 12    Deangelo Chester testified that he was currently on parole after a felony weapon conviction and that he had several other prior convictions. Chester testified that he did not remember anything about April 24, 2011. Chester related that he did drugs, popped pills, and smoked PCP and ecstasy. Chester stated that he had a "short memory term" and that he had been jumped on and shot.

¶ 13    Chester testified that he also did not recall speaking to detectives on September 28, 2011. Chester did not deny making statements to the detectives but said that he was "probably" making the statements up. Chester did not recall identifying individuals in photo arrays during an interview, but he admitted that his signatures were on the photo arrays. Chester guessed that the descriptors by his signatures were written by him. Chester was asked if he saw defendant in court and he initially responded, "Yeah, I see him." When the prosecutor asked Chester to point to defendant and describe an article of clothing he was wearing, Chester responded, "I can't see him."

¶ 14    On cross examination, Chester testified that he "briefly" remembered a visit from defendant's attorneys and an investigator while Chester was in jail in 2015. Chester told defendant's representatives "what they wanted to hear" and that he did not provide a ride to

defendant or anyone with a face tattoo in exchange for weed. On redirect, Chester testified that he told defendant's representatives that he did not remember what happened back in 2011.

¶ 15    Chicago Police Sergeant Clifford Martin Sr. testified that he was assigned as a detective to a possible homicide at 7940 South Greenwood Avenue in Chicago. Martin testified that the deceased victim, Dushawn Davis, was inside the residence. Martin observed that the apartment appeared to have been ransacked, with the drawers open and items strewn around.

¶ 16    On September 28, 2011, Sergeant Martin interviewed Chester and the interview was video and audio recorded. The interview was admitted into evidence, and portions of the interview were published to the jury. Prior to getting Chester's version of events, Martin told Chester that Brown had informed officers that Chester drove him and another person over to Davis's apartment, that Chester waited in the alley, that Brown and another came down with "proceeds," that one of the individuals pointed a firearm at a man in the alley, and that an individual named Kamal had set up the robbery. Martin told Chester that they were "missing someone" from the story.

¶ 17    Chester explained that defendant, who Chester referred to as "Marvo," called him and asked Chester for a ride to buy marijuana. Chester agreed to give defendant the ride in exchange for a portion of the marijuana. Chester picked up defendant and a guy with a face tattoo, later identified as Joshua Brown, around 79th and Luella. Chester drove defendant and Brown to the front of a building at 7940 South Greenwood Avenue. Defendant instructed Chester to drive to the back of the building, but Chester initially did not know how to go around back because the street appeared to be a dead end. Chester eventually drove to the alley behind the building. Chester attempted to go with defendant and Brown to see the marijuana, but Chester was directed to remain in the vehicle in the alley.

¶ 18      Defendant and Brown entered the apartment. Later, Chester saw Brown and defendant running out of the apartment. Defendant and Brown were sweating and had gloves on. Chester identified Brown in a photo array and wrote "came out with backpack." Chester also identified defendant in a separate photo array and wrote "came out *** with the gun and told me to drive away." Chester explained to the detectives that defendant ran out with a gun and pointed it at an individual in the alley who was carrying a broom. After chasing the other individual, defendant returned to the vehicle and directed Chester to drive away. In the car, Chester observed a long case and overheard defendant and Brown discussing who would get what items. Chester drove defendant and Brown back to the area around 79th and Luella.  Defendant directed Chester not to say anything to anyone.

¶ 19      Yasmine Richie testified that she had known defendant since 2008. Richie met defendant at 79th and Luella where she lived from 2008 to 2012. Richie and defendant were dating in April 2011. Richie testified that she did not really recall anything about April 24, 2011. Richie testified that Joshua Brown was her cousin and that she knew Ian Burke from the neighborhood.

¶ 20      Richie testified that she spoke to detectives at the courthouse at 26th and California on March 7, 2013. Richie also agreed that she spoke to someone else at the courthouse, but she did not know the individual by name. The individual was Assistant State's Attorney Susanne Groebner. Richie testified that she told Groebner and the detectives "[w]hat they wanted to hear." Richie knew what they wanted to hear because the detectives told her. Richie agreed to give Groebner a handwritten statement because she was told that she would be arrested if she did not. Richie also agreed that she testified before the grand jury. Richie testified that although she was under oath before the grand jury, she did not answer questions truthfully.

¶ 21    On August 17, 2015, Richie wrote a letter that was notarized. In the letter Richie wrote that she was "harassed into bearing false witness and statement against [defendant]." Richie also wrote that she was being investigated for a murder and was scared into making the statement. Richie wrote that she was scared of the Chicago police because they were threatening to lock her up and take away her children. Richie finally wrote that, at the time of her written statement and grand jury testimony, she was very angry with defendant because defendant had cheated on her.

¶ 22    ASA Groebner testified that she was working with the Felony Review Unit when she met with Richie on March 7, 2013. Richie agreed to give a written statement. Groebner wrote down what Richie said, Richie went over the statement to make additions and corrections, and then Richie signed off on each page verifying the accuracy of what was said.[2] ASA Groebner also presented Richie to the grand jury on March 7, 2013. Groebner testified that Richie was cooperative. Richie never stated that she had been threatened by the police or was coached into making the statement. Because the written statement and the grand jury testimony were largely consistent, Richie's version of events as conveyed on March 7, 2013, will be set forth together below.

¶ 23    Richie knew defendant since around 2008 from the neighborhood. The two had dated on and off starting in 2009. They resumed their relationship in March 2011 after a brief stint apart. Richie remembered April 24, 2011, because she was having a birthday party for herself that night and was getting her hair done at her apartment that day. Richie stated that she spoke to Joshua Brown on the phone that morning and that he later arrived at the apartment.

---

[2] Defendant states in his brief that Richie gave her written statement at 3:09 a.m., but the record establishes that the statement was taken at 12:50 p.m.

¶ 24    Defendant and Brown talked in the hallway. Defendant was wearing all dark clothing and Brown changed into some of defendant's clothes, which were also all dark. Defendant and Brown left the apartment and came back a few hours later. Defendant and Brown were in the hallway of Richie's apartment with a flat-screen television, a game system, a shotgun, and a handgun. Defendant and Brown discussed who would get which items, with defendant getting the handgun and shotgun and Brown getting the television and gaming system.

¶ 25    Later the same night was Richie's birthday party at a club. Both defendant and Brown attended the party. Brown was unusually quiet at the party and acted sad. Defendant got "drunk" at the party and returned to Richie's apartment after the party. Back at the apartment defendant was "crying" and "hysterical." Defendant asked to use Richie's phone to call his mother. Richie could hear both sides of the conversation because defendant had the phone on speaker. Richie testified before the grand jury that defendant told his mother the following: "That he love her. He did something bad. He wanted to move to Texas when she moved, and he had shot someone."

¶ 26    A few days after the party, Richie saw Brown and Ian Burke talking at the corner of 79th and Luella. Brown was "hysterical" and "crying." Richie heard Burke confront Brown, stating that that was his best friend, that Burke was Brown's best friend, and that if Brown could do that to him then he could do it to Burke. Burke also said that Brown was "bogus" for going to the funeral and hugging his mother. Defendant then saw Richie walking and Richie got into defendant's vehicle. Richie conveyed her observations of Brown and Burke's conversation to defendant. Defendant told Richie that "he had to whack [Burke] and [Brown's] friend because he [knew] who [defendant] was."  Richie then asked defendant who he had to "whack" and defendant responded, "Dushawn, the boy from the Don Nash Center."

¶ 27    Cook County Chief Medical Examiner Ponni Arunkumar was qualified as an expert in forensic pathology and testified that she reviewed the autopsy report in the case of Dushawn Davis. Dr. Arunkumar testified that Davis suffered from three gunshot wounds, one on the left cheek, one on the left neck, and one on the left arm. Dr. Arunkumar testified that Davis's cause of death was multiple gunshot wounds. The parties stipulated that Dr. James Filkins was an assistant medical examiner for Cook County on April 25, 2011, and that he conducted the autopsy of Dushawn Davis, including taking numerous pictures and recovering fired bullets from Davis's chin and left arm.

¶ 28    The parties also stipulated that the DNA profile from a pillow and t-shirt found at the scene matched Davis but did not match Brown or defendant. The parties also stipulated that of the four latent print lifts collected by the Chicago police, none matched Brown or defendant.

¶ 29    The jury found defendant guilty of armed robbery with a firearm and not guilty of first degree murder. The trial court sentenced defendant to 38 years' imprisonment. Defendant was sentenced on June 15, 2021. Defendant filed a motion to reconsider, which was denied, and a notice of appeal on the date he was sentenced. This is a direct appeal of the trial court's judgment.

¶ 30                              II. ANALYSIS

¶ 31    Defendant first argues that the State failed to prove that he committed armed robbery with a firearm beyond a reasonable doubt. Defendant contends that Chester and Richie's prior inconsistent statements are "essentially worthless" because each witness suffered from a "total lack of credibility." Defendant also points out that neither the robbery proceeds nor the firearm used was ever recovered, none of the biological evidence implicated defendant, and there was no eyewitness to what occurred inside Davis's apartment.

¶ 32    The State responds by criticizing defendant's argument because defendant accepts Richie and Chester's testimony when it helps his case, but defendant attacks their statements when it hurts his case. The State argues that recantations are inherently unreliable. The State also argues that Richie's and Chester's prior inconsistent statements were "similar in that they both provided detail of defendant's involvement in the crimes" and they "were consistent with each other." The State concludes that defendant's arguments on appeal were all presented to and rejected by the jury.

¶ 33    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 34    Here, Richie and Chester's prior inconsistent statements sufficiently corroborate each other to uphold the jury's verdict. Each also provided unique details that they would not have known but for their actual knowledge of defendant's involvement in the armed robbery of Davis. To start, Richie stated that defendant was at her apartment with Brown, near 79th and Luella, in the early part of the day on April 24, 2011. Chester stated he was summoned by defendant to the area of

79th and Luella, where Chester picked up defendant and Brown. Chester then drove defendant and Brown to a residence in the 7900 block of South Greenwood Avenue. After hearing gunshots, Chester saw defendant and Brown run back to the car. Chester stated that when defendant and Brown returned to his vehicle, they had a backpack and a long case. Chester saw what he thought was a PlayStation 3 sticking out of a backpack. Defendant and Brown discussed who would get which items. Chester then dropped defendant and Brown back off near the area of 79th and Luella. Richie stated that when defendant and Brown returned, they had items, including a game system, a handgun, and a long gun. The two discussed who would get which items, with Brown getting the television and game system and defendant getting the two firearms.

¶ 35    Photographic evidence also supports the proposition that Chester had knowledge of the area around the crime scene. Chester told police that he initially pulled up in front of Davis's apartment, before defendant told him to pull around to the back. Chester was initially confused because the street appeared to dead end, which is illustrated by photos showing that, at the end of the 7900 block of South Greenwood, there is a do not enter sign. Further, all three individuals, Woods, Chester, and Richie, stated that defendant and Brown possessed either a long case or long gun, another unique fact that was highly unlikely to be pulled out of thin air by Richie and Chester. While none of these facts standing alone are overwhelming evidence of defendant's guilt, they make it unlikely that both Chester and Richie made up stories that were consistent with each other and that of an eyewitness.

¶ 36    We agree with defendant that the officers interrogating Chester told him that he was the alleged driver and, that if he was only driving and did not know of the criminal plan, he would not be liable for the others' actions. However, Chester was the first person to bring up the name

"Marvo," who he later identified as defendant. Chester also independently supplied that he picked Brown and defendant up at 79th and Luella, that Davis's residence was near a dead-end, and that Brown and defendant came out of the residence with a gaming system and a long case. Thus, while there was certainly information fed to Chester by the officers, Chester supplied enough corroborated information independently so that a rational trier of fact could have found his prior statements more credible than his trial testimony.

¶ 37     Finally, we recognize that there are several cases where prior inconsistent statements were held insufficient to uphold a conviction. Each case relied on its own set of facts and did not purport to set out a rule holding that prior inconsistent statements could never support a guilty verdict. In *People v. Arcos*, the court concluded that the evidence was insufficient where the trial court, acting as the trier of fact, found the State's lone eyewitness incredible and the corroborative evidence was wanting. *People v. Arcos*, 282 Ill. App. 3d 870-71, 876 (1996). In *People v. Brown*, the court found the evidence insufficient where the State's case was based primarily on a prior inconsistent statement, disavowed at trial because it was coerced, that was made for the first time two years after the shooting. *People v. Brown*, 303 Ill. App. 3d 949, 965 (1999). In *People v. Parker*, three eyewitnesses testified that the defendant did not participate in the crime, in conflict with their prior statements implicating the defendant. *People v. Parker*, 234 Ill. App. 3d 273, 280-81 (1992). The court found the evidence insufficient because the witnesses gave explanations for their false prior statements and no physical evidence supported the guilty verdicts. *Id*.

¶ 38     These decisions do not mandate a reversal in this case. Richie gave her prior statements under oath before the grand jury. Chester gave his prior statements to the police in a video-taped interview, which the jury was able to view. The jury was also able to assess Richie and Chester

when they testified that their prior statements were made up. It was in the province of the jury to believe the detailed prior inconsistent statements as opposed to the in-court testimony that the prior statements were untrue. See *People v. Curtis*, 296 Ill. App. 3d 991 (1998) (explaining that once "a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may *not* engage in any such analysis") (emphasis in original). The jury here clearly found Richie and Chester's detailed pretrial statements implicating defendant more credible than their trial testimony. We will not substitute our judgment for that of the jury. See *People v. Logan*, 352 Ill. App. 3d 73, 80 (2004). Because a rational juror could have found the prior statements more credible than the trial testimony, we affirm defendant's conviction for armed robbery with a firearm.

¶ 39    Defendant next argues that he was deprived of his right to a fair trial because the trial court allowed the State to admit as substantive evidence Richie's written statement that she overheard defendant state to his mother on the telephone that he had shot someone. Defendant argues that Richie's written statement did not satisfy the personal knowledge requirement of 725 ILCS 5/115-10.1 (West 2018). Defendant continues that Richie's statement was not admissible even as impeachment because her trial testimony did not affirmatively damage the State's case. Defendant concludes that the admission of Richie's written statement on this point was not harmless because, although the same statement was properly admitted by way of Richie's grand jury testimony, the admission of the written statement improperly bolstered that evidence.

¶ 40    The State responds only that Richie's written statement was inconsistent with her trial testimony and, thus, was admissible on that basis. The State does not respond to defendant's

argument that Richie lacked personal knowledge under the statute or defendant's argument that Richie's trial testimony did not affirmatively damage the State's case. The State also argues in the alternative that any error in the admission of the portion of the written statement at issue is harmless where the same statement was properly admitted through Richie's grand jury testimony.

¶ 41    We agree with defendant that the portion of Richie's written statement where she wrote that defendant told his mother that he had shot someone was inadmissible under 725 ILCS 5/115-10.1 (West 2018). The statutory provision for prior inconsistent statements provides: "[A] statement made by a witness is not made inadmissible by the hearsay rule if (a) the statement is inconsistent with his testimony at the hearing or trial, *** (b) the witness is subject to cross-examination concerning the statement, and (c) the statement *** narrates, describes, or explains an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1 (West 2018). Our supreme court has held that the "personal knowledge" requirement means that "the witness must have actually perceived the events that are the subject of the statement, not merely the statement of those events made by the defendant." *People v. Simpson*, 2015 IL 116512, ¶ 41.

¶ 42    Here, there was no evidence that Richie perceived any shooting, let alone the alleged shooting of Dushawn Davis. Thus, Richie's prior inconsistent written statement was not admissible as substantive evidence. The statement was also not admissible as impeachment because Richie's testimony on this point did not affirmatively damage the State's case. See *People v. Cruz*, 162 Ill. 2d 314, 360 (1994) ("Affirmative damage results only from testimony that gives positive aid to an adversary's case."). When Richie was confronted about her written statement that defendant had told his mother he shot someone, Richie merely stated that she did not recall making the statement. Richie's other trial testimony did not affirmatively damage the State's case where she either did

not remember details from April 24, 2011, or she stated that she had been untruthful in her written statement. "It is insufficient that a witness merely disappoints the State by failing to incriminate the defendant." *People v. McCarter*, 385 Ill. App. 3d 919, 933 (2008). Richie's written statement reciting defendant's statement that he had shot someone was not admissible for any purpose.

¶ 43 We now must determine whether the error in the admission of Richie's written statement was harmless error. Our supreme court has recognized three approaches for deciding whether an error is harmless: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 44 We conclude that the erroneous admission of Richie's written statement was harmless because it was cumulative of properly admitted evidence. See *People v. French*, 2017 IL App (1st) 141815, ¶ 44 (holding that the erroneous admission of an individual's prior inconsistent statement was harmless because "essentially the same evidence was properly and substantively introduced through [the individual's] grand jury testimony"). Defendant concedes that Richie's grand jury testimony was properly admitted as substantive evidence and "mirrored" her written statement. Before the grand jury, Richie testified that she heard defendant tell his mother, on the day of Davis's murder, that he had done "something bad" and that he had "shot someone." This evidence was identical to Richie's written statement.

¶ 45 We also reject defendant's argument that the improper admission of the written statement bolstered Richie's grand jury testimony. In context, the two statements were identical versions of

Richie's account of events. Both statements were given on the same date. The written statement was the summary of Richie's version of events as provided to ASA Groebner. Richie's grand jury testimony essentially formalized the written statement and ensured the veracity of the statement as Richie was under oath. There was such a continuation between the written statement and the grand jury testimony that they were nearly one in the same. In short, we are not concerned that admission of the written statement served to bolster Richie's grand jury testimony. Because evidence identical to that complained of was properly and substantively admitted, the error in the admission of Richie's written statement was harmless.

¶ 46    Defendant's final argument in his opening brief is that he was denied his right to a fair trial where the trial court coerced minority jurors into reaching a guilty verdict by asking the jury for a count and instructing the jury to continue deliberating after they were deadlocked for several hours. Defendant also argues that trial counsel was ineffective for failing to request a *Prim* instruction after the jury indicated it was deadlocked. In his reply brief, defendant appears to retract his argument that either the trial court or trial counsel erred. Defendant states: "In the ensemble, the '*Prim*' issue raised by defendant in his opening brief-post-*Ford*-is unavailing. Hence, it is unlikely that, in *Ford*'s wake, defendant can prevail on his '*Prim*' issue."

¶ 47    We agree that defendant's opening brief argument is unavailing. The Illinois Supreme Court's decision in *People v. Prim*, 53 Ill. 2d 62 (1972), has been adopted in Illinois Pattern Instructions, Criminal, 26.07. The instruction is appropriate when a jury is deadlocked. The Committee Notes for IPI 26.07 state that the "Committee takes no position on whether this instruction should be given or under what circumstances it should be given." The Illinois Supreme Court has stated that nothing in its "case law or the constitution indicates that

the *Prim* instruction is mandatory, even on request of the parties." *People v. Kimble*, 2019 IL 122830, ¶ 45. The court in *Kimble* also held that a general instruction to "continue deliberating" is a "clear and noncoercive response well within the court's discretion." *Id.* ¶ 44.

¶ 48    Here, the jury retired to deliberate at 11:30 a.m. At 2:15 p.m. the jury asked when Richie testified before the grand jury and for Richie's statement to the grand jury. At 5 p.m. the jury requested Richie's notarized letter and her jail letter to defendant. At 5:20 p.m. the jury sent the following note: "We are unable to come to a unanimous decision on the charges of first degree murder and armed robbery."

¶ 49    The trial court proposed potentially asking the jury for a numerical breakdown of the jury's vote without an indication of which side the votes were on. The State objected, requesting that the court instruct the jury to continue deliberating. The trial court discussed potentially giving the jury the *Prim* instruction. When the trial court asked the defense for its position, trial counsel stated: "Judge, we can do the count." The trial court sent the following response to the jury: "Jurors, without telling me which way the numbers are going[.] *** What is your numerical split?" The jury responded: "First degree murder, six to six. Armed robbery, nine to three." The trial court proposed asking the jury how long the count remained the same. When asked, defense counsel responded, "That's fine." The trial court asked the jury, "Jurors, how long has the count remained the same?" The jury responded, "6:45 p.m. We have taken three votes since we began deliberation. We have been six to six vote on first degree murder for several hours. We have been at the nine to three vote on armed robbery for a few hours longer."

¶ 50    The trial court stated that it could either instruct the jury to continue to deliberate or give the *Prim* instruction. The State requested that the court instruct the jury to continue deliberating

because it had only been about seven hours and there was detailed testimony. The defense responded, "We will ask that they continue to deliberate." With the parties in agreement, the trial court instructed the jury as follows: "Jurors, you have all the evidence. Please continue with your deliberations." The jurors reached their verdict at 7:20 p.m. Defendant was acquitted of first degree murder and found guilty of armed robbery.

¶ 51 "It is well settled that a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Hibler*, 2019 IL App (4th) 160897, ¶ 60; *People v. Villareal*, 198 Ill. 2d 209, 227 (2001) (explaining that it would "offend all notions of fair play" to allow a defendant to object on appeal to verdict forms he requested at trial). Here, defendant expressly requested that the trial court respond to the jury in ways that he now claims were error. He is prohibited from claiming error in actions he urged the trial court to take.

¶ 52 Acquiescence aside, the trial court did not err in instructing the jury to "continue to deliberate." As our supreme court in *Kimble* held, a general instruction to "continue to deliberate" is a "clear and noncoercive response well within the court's discretion." *Kimble*, 2019 IL 122830, ¶ 44. This court has also recently rejected an ineffective assistance of counsel claim based on the failure to request a *Prim* instruction. See *People v. Ford*, 2022 IL App (1st) 172581, ¶ 32 (noting that the lack of a *Prim* instruction did not deny the defendant his right to a fair trial). In short, we agree with defendant's apparent concession in his reply brief that any argument about the lack of a *Prim* instruction is meritless.

¶ 53                                          III. CONCLUSION

¶ 54 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 55    Affirmed.