2020 IL App (2d) 180474-U
No. 2-18-0474
Order entered December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2916 |
| SEAN D. BURKS, | ) ) | Honorable Donna R. Honzel, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence was sufficient to convict the defendant of unlawful possession of a weapon by a felon where the court admitted as substantive evidence an eyewitness's prior inconsistent statements identifying the defendant shooting one of the victims, even where the eyewitness recanted her prior statements at trial; and the trial court's sentencing of defendant to 10 years' imprisonment was not an abuse of discretion where it properly considered the defendant's criminal background, nature of the offense, and the need to deter others. The trial court is affirmed.

¶ 2    A jury found defendant, Sean D. Burks, guilty of unlawful possession of a weapon by a

felon (720 ILCS 5/24-1.1 (West 2016)). The trial court sentenced defendant to 10 years in prison.

In this appeal, defendant argues that 1) the State failed to prove him guilty beyond a reasonable

doubt where the only evidence against him was the prior inconsistent statements of a witness who recanted her statements at trial, and 2) the sentence imposed by the court was excessive. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with 39 counts of various offenses relating to shootings at the Cliffbreakers Hotel in Rockford on January 1, 2017, involving the shooting death of Joshua Jamerson and the shooting injuries of three others. The State charged defendant with 32 counts of murder (counts 1-32), three counts of aggravated discharge of a firearm (counts 33-35), three counts of aggravated battery with a firearm (counts 36-38), and one count of unlawful possession of a weapon by a felon (count 39).

¶ 5     Prior to trial the trial court granted the State's motion in *limine* to admit, as substantive evidence, the prior inconsistent statements of Inishia Cooper provided to the grand jury and to the police as a signed written statement under section 115-10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1 (West 2018)). The court also granted the State's motion in *limine* regarding Cooper's identification of defendant as "the shooter" in photo lineup.

¶ 6     The jury trial began on March 6, 2018. Rockford police officer Dmitry Zhurba testified as follows. On January 1, 2017, at about 3:30 a.m., Zhurba and three other officers were dispatched to the Cliffbreakers Hotel regarding a shooting. The officers responded to the fourth floor and saw Jamerson lying on his back in the hallway between room 425 and 427, apparently killed by a gunshot wound to the abdominal and chest area. Cooper and Yavonna Pittman were with Jamerson..   Empty liquor bottles and numerous shell casings littered the hallway. Zhurba saw that a man in room 422, later identified as Jose Breedlove, had been shot in the buttocks. Zhurba spoke

with Cooper, and then police officers took her to the public safety building at the Rockford Police Station to be interviewed.

¶ 7    Detectives James Gulley and Bradley Shelton both testified as follows. On the morning of January 1, 2017, Gulley and Shelton interviewed Cooper at the public safety building at the Rockford Police Station in connection with the shooting at the Cliffbreakers Hotel. Cooper was cooperative and agreed to complete a signed written statement. The date and start time on the written statement was January 1, 2017, 9:30 a.m. Neither Gulley nor Shelton threatened Cooper, made any promises to her, or told her what to say.

¶ 8    Cooper's signed written statement began "[m]y name is Inishia Cooper and I am currently staying at the Cliffbreakers Hotel room #409 ***. I am here to explain what I saw at the hotel. Cooper then described how she woke up around 3:15 a.m. on January 1, 2017, to "very loud yelling out in the hallway outside [her] room." Cooper stated that she opened her door and saw a person she knew, Marcus Dyson, with another person who seemed drunk. Cooper spoke with the two men about how they were being loud and disrespectful and then went back in her room. Cooper then wrote that she was about to go back to bed, but the screaming got louder and louder. She described what happened next:

>     "I opened my room door and looked to the right and saw a lot of people in the hallway and two guys were physically fighting. I saw one of the guys fighting fall to the ground. He was a black guy wearing a black t-shirt. The other guy, who wore a yellow, burgundy, and black sweater, continued to fight standing over the guy in the black t-shirt throwing punches. I could hear people saying to let him go and leave him alone. The guy with the black t-shirt was trying to get up and couldn't get up. The other guy with the yellow, burgundy, and black sweater fired two shots toward the guy in the black t-shirt. I could see

the guy in the black t-shirt start to stand up and he was half way standing up when the guy in the yellow, burgundy, and black sweater fired about three or four more shots at the guy in the black t-shirt. The guy in the black t-shirt fell to the ground. The shooter then walked back in my direction like he was about to leave and then turned and faced the group of people. I could still see him standing in front of my room as I was looking out and he was still holding the gun in his hand. I described him as a black male, about 25 or 26 years old, about 5'10", 180, 190 pounds. A young[-]looking face with thin hair on his chin and thin mustache wearing a yellow, burgundy and black hat which is like a beanie or skully hat that was tight on his head and I could tell his hair was short like he had a fade. The shooter's sweater and hat had the same colors and were wide horizontal stripes. I could see the gun in his hand was a black gun, possibly a Glock 9mm. I think it was this type of gun because I have shopped for guns and am familiar with them. The shooter then said to the other in the hallway, 'Let's get the f**k out of here[.]' The shooter turned to leave the hall and I closed my door. I could see the people through the peep hole leaving. ***

I went out in the hallway while my daughter watched from the room doorway. I went to check on the guy in the black t-shirt and saw another guy that had been shot. He was laying just inside one of the rooms and he was wearing a white t-shirt, jeans, and checkered boxer shorts. There was another girl in the room with him trying to talk to him and he was holding his butt."

¶ 9 Cooper also wrote that she attempted to help the man in the black t-shirt. She stated that there was another woman with the victim saying "someone call 911" and "please don't die on me, Josh wake up." Cooper wrote that she looked up and saw the police and went back to her hotel

room, and then the police knocked on her door and eventually took her to the police station. The written statement was admitted as substantive evidence.

¶ 10    Gulley and Shelton also testified that Cooper read her statement in their presence, initialed every paragraph, and signed the statement. During the interview, she never identified the shooter by name. Cooper only provided a physical description of the shooter and what he was wearing. Both Gulley and Shelton testified that when they met with Cooper, they were unaware that defendant was at the hotel party and were unaware of what he was wearing that night. Neither Gulley nor Shelton ever said defendant's name during their conversation with Cooper.

¶ 11    Detective Donald Duglar of the Rockford Police Department testified as follows. Two days after the shooting, on January 3, 2017, Duglar showed Cooper a photo lineup regarding the shooting. The photo lineup occurred in Cooper's room at the Cliffbreakers hotel. Duglar did not prepare the photo lineup and did not know who the suspect was in the photo lineup. Cooper identified defendant's photo and stated, "I'm sure that's him. I pictured him with a hat on. He looked right at me and I don't forget a face." Cooper circled defendant's photo and signed it. Cooper also wrote on the photo lineup next to defendant's photo, "He looked in my face the day of the shooting." The photo lineup was admitted into evidence.

¶ 12    Kathy Berg, a court reporter with the Winnebago State's Attorney's Office, testified that on January 27, 2017, she transcribed Cooper's testimony before the grand jury. Cooper's grand jury testimony was admitted as substantive evidence and included the following testimony which was consistent with her prior written statement provided to police on the morning of the shooting. The transcript indicates that the prosecutor asked Cooper open-ended questions and she provided detailed and lengthy responses. Cooper testified that "there was a party a couple of rooms down from mine and I was a witness to a shooting." She awoke to "[l]oud screaming, yelling, talking

loud, and just loud people period." Cooper opened the door and saw Marcus Dyson, a close family friend, with some other guys. She spoke with Dyson about how they were being rude and loud and then she closed her door and went back inside her hotel room. When Cooper heard screaming, she opened her door again. She saw "a group of people and some people fighting, two guys fighting." A guy "pulled out a gun and got to shooting." A man with a black shirt fell "and the guy was still fighting with him but then he pulled out the gun and started shooting again."

¶ 13    Cooper also told the grand jury "the first time it was like pow, pow, pow, but the guy that was on the ground, I don't think he was shot at that time because he tried to get up. And then the guy shot again a few times and then he was almost off the ground but he fell back and that's when I knew that he got shot." Cooper heard multiple gunshots. She testified that she went out to the hall and, "[T]he guy walked past my door and I saw him. Like he was literally in front of me so I could really see who he was. And I was like wow, wow, wow, oh my God, oh, my God." Then "he turned around and he had the gun in his hand and he was like, y'all, let's go, let's get the f**k up out of here, and that's when he took off." Cooper went back into her room and her daughter told her to "make sure that guy is okay." Cooper went back out into the hall and noticed that "the guy wasn't moving and [she] noticed that across from him there was another guy laying on the ground on the floor and he was shot too." Cooper described the gun as a "black nine-millimeter" and testified that she knew this "because [she] had a FOID card before and [she] went to MC Sports and that was one of the guns [she] was trying to purchase."

¶ 14    In addition, Cooper testified before the grand jury that while she was trying to help the man lying in the hall, there was a "girl" yelling, "Josh, wake up." Cooper then noticed that the police had arrived and she went to her room. Police officers came to Cooper's room and asked her if she knew anything about the shooting. Cooper testified, "Part of me wanted to say no but I was like,

yes, I saw it, because the officers basically walked up while I was right there with the dead body so I couldn't lie. So I told them what I saw." Cooper told the grand jury that she reviewed the written statement she provided to the police later that day and testified that it was complete, accurate, and truthful. She also testified that her identification of defendant during the photo lineup was true and accurate. Cooper did not know defendant's name at the time of the photo lineup and identified him as the "guy that was doing the shooting at the party."

¶ 15    At trial, Cooper testified differently than her prior statements. She testified that she was at the Cliffbreakers Hotel on the night of the shooting with her daughter and that there were many parties going on. She also testified that she asked people to keep it down and that she saw Marcus, a family friend, but claimed not to know his last name. Cooper testified that after she saw Marcus, she went back to sleep. Contrary to her prior statements Cooper testified that she was in her room when the police arrived. She did not provide the police with a description of anyone. Cooper heard gunshots but believed they came from outside the hotel. Cooper testified that she told police "there were parties that night and we couldn't control anything." Cooper testified that she went to the police station to speak with the police about what happened. When she left the hotel with police, there was nothing unusual in the hallway.

¶ 16    Cooper also testified that did not remember providing a written statement to police, and she could not recall picking defendant's picture out in the photo lineup. After being shown her written statement she acknowledged her signature and initials on multiple areas of the written statement. The prosecutor then read the entire statement and Cooper testified that she did not remember saying any of it to police. Cooper also repeatedly denied being able to recall her grand jury testimony.

¶ 17 When the prosecutor asked Cooper, "Is this the photo lineup the defective showed you [on] January 3, 2017?" Cooper replied, "I don't remember none of that, but that's my signature. So, apparently, that's what they showed me." Cooper acknowledged that defendant's photo had her signature on it. She also testified that she did not remember writing, "He looked at my face on the day of the shooting." Then, the prosecutor asked Cooper, "Do you remember being shown this photograph [of defendant]?" She replied, "I don't remember anything. All I know is that I was dealing with too much being homeless and I was just wanting to be safe with my kid. So I don't remember none of that."

¶ 18 Cooper testified that she did not remember the substance of her grand jury testimony. The prosecutor read the entire transcript of Cooper's grand jury's testimony and asked her whether she was asked each question and gave each answer. Cooper testified that she did not remember. Cooper also testified that she did not know defendant.

¶ 19 During cross-examination, Cooper recanted her prior statements implicating defendant. When questioned by defense counsel, she testified as follows:

"Q. Ms. Cooper, did you witness this shooting on January 1st, 2017?

A. No.

Q. Did you witness [defendant] shoot anyone January 1st, 2017?

A. No.

Q. In reference to this written statement that you completed, is anything accurate in this statement?

A. To be honest, I don't even remember writing that, so I can't answer that. I don't remember.

Q. So you don't even remember making this statement?

A. No, like I said, it was so much that was going on that, I don't remember none of it.

Q. And so the only thing you do remember is the police being at your door at 3:00 a.m.; is that correct?

A. Yes.

Q. And so what, if anything, do you remember at all from January 1st, 2017, that occurred?

A. Like I said, it was a bunch of parties that day and I remember talking to the police and they asking me did I know anybody, did I see anything. And then a couple of days later – well, not a couple days later, probably like a week later they basically had me go back downtown and they basically was [*sic*] trying to put words in my mouth and was promising me things but that's what police do. And the only thing I was remembering was, the back of my mind is what happened to my brothers, my situation. And like I said, my mind was just full of different things, going through different emotions and feelings."

Cooper also testified that, on the morning of the shooting, she heard "quite a few gunshots" but that she believed that they came from outdoors. She testified that the grand jury testimony read by the prosecutor could have taken place and "it couldn't have." She did not "remember."

¶ 20    Rockford detective Michael Battaglia testified as follows. In the early morning on January 1, 2017, Battaglia went to the Rockford Memorial Hospital to check on shooting victims Jaron Burden, Jermaine Hunter, and Breedlove. Hunter was shot in the arm, Breedlove was shot in the lower back and leg, and Burden was shot in the arm. After Battaglia left the hospital he went to the Cliffbreakers Hotel and took a video of the scene which was admitted into evidence and published to the jury. As the video played, Battaglia described what was depicted. The video

depicted the fourth floor of the hotel. Numerous "spent" shell casings, "a bullet strike to the wall," blood on the carpet and on a wall, a body, alcohol bottles, a Coca-Cola bottle containing alcohol, and two baseball caps. Down the stairwell the video depicted blood on the wall and on a door handle.

¶ 21    Detective Brian Strawser testified that the shell casings found at the scene were 9 mm. caliber and that there were two types of casings, brass and aluminum.

¶ 22    Detective Mark Gibbons testified that inside room 422 was a Kel-Tec 9 mm. caliber semiautomatic firearm with a magazine. Seven live rounds were recovered from that weapon. Gibbons collected the firearm, "tagged" it "into evidence, sealed the packaging, and signed and dated it. The Kel-Tec was admitted into evidence.

¶ 23    Detective Bruce Voyles testified as follows. Voyles examined the Kel-Tec on January 4, 2017. Voyles test fired the weapon and opined that all the casings from the scene did not come from the Kel-Tec.

¶ 24    Forensic scientist Christina Davison also tested the Kel-Tec firearm and concluded that four of the recovered spent casings found at the scene were fired from that firearm and the other 10 spent casings were fired from another firearm.

¶ 25    Forensic pathologist Dr. Mark Witeck testified that Jamerson died from a gunshot wound to his back.

¶ 26    Breedlove testified that, on the morning of the shooting, he was in a room at the Cliffbreakers Hotel with Jamerson and others when Perez entered through the door to the adjoining room. Burden, who had been in the other adjoining room, got into a fight with Breedlove in the hallway. Burden punched Breedlove and was on top of Breedlove. During this fight Breedlove

heard five or six gunshots and was shot in his lower back and leg. Breedlove did not see who fired the shots, was "cool" with defendant, and did not see defendant with a gun.

¶ 27 The court admitted into evidence a certified copy of defendant's 2010 felony conviction for unlawful delivery of cannabis. The court also admitted photographs of defendant taken at the hotel on the date of the shooting that showed defendant wearing a yellow shirt over a maroon shirt, and a maroon knit hat with a yellow and black stripe.

¶ 28 The court granted defendant's motion for a directed verdict as to counts 36-38, three counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)). These counts separately alleged that defendant knowingly discharged a firearm causing injury to Hunter, Breedlove, and Burden. The court reasoned that there was no evidence that defendant was specifically shooting at those individuals.

¶ 29 Justin Hunter testified on behalf of defendant that he saw defendant in a room at the Cliffbreakers Hotel on the morning of the shooting and that about 10 minutes later, Hunter was shot in the hallway. Hunter did not see defendant with a firearm.

¶ 30 Dyson testified that, on the morning of the shooting, he was at a party at the Cliffbreakers Hotel and defendant was also there. Dyson went into the hallway and spoke with Cooper. While speaking with her, Dyson heard gunshots. Cooper tried to pull him into her room, but Dyson dropped to the ground. When Dyson got up he saw somebody on the ground with a gun in his hand, but the man with the gun was not defendant. Dyson did not see defendant in the hall when gunshots were fired and did not see defendant with a gun.

¶ 31 Defendant testified that, in the early morning of January 1, 2017, he was at a party at the Cliffbreakers Hotel. He heard about the party from his best friend, Burden. Defendant, 32 years old, went to high school with Cooper and Marcus Dyson. There were 50 to 60 people at the party

when he arrived after midnight. There was a fight and a shooting at the hotel while he was there. When defendant heard the gunshots, he was "coming down the stairs," leaving the party "with a multitude of people." He did not know who was fighting that morning, did not possess a firearm, did not shoot anybody, and was not involved in any fight or argument. Defendant did not see a fight between Joseph Perez and Burden. That morning, defendant wore a yellow and maroon jacket with a matching hat.

¶ 32     The court then granted defendant's motion for a directed verdict for counts 25 through 32. These counts alleged felony first-degree murder predicated on aggravated battery with a firearm. As the court had already directed out counts 36 through 38, various counts of aggravated battery with a firearm, the court held that first degree murder convictions could not be predicated on aggravated battery with a firearm.

¶ 33     The jury found defendant guilty of unlawful use of a weapon by a felon and not guilty of aggravated discharge of a firearm and murder.

¶ 34     On May 4, 2018, the trial court denied defendant's motion for judgment notwithstanding the verdict. The court noted that the evidence was clear that "the scene *** contained not one but two different firearms" and that the Kel-Tec found in room 422 was not the weapon used by defendant.

¶ 35     Also, on May 4, 2018, the court sentenced defendant to 10 years' imprisonment. Defendant filed a motion to reconsider sentence on May 11, 2018, which the trial court denied on June 15, 2018. Defendant filed a notice of appeal the same day. After defendant was appointed appellate counsel, an amended notice was filed on June 25, 2018.

¶ 36                                II. ANALYSIS

¶ 37                         A. Sufficiency of the Evidence

¶ 38    Defendant argues that the evidence against him was insufficient to prove beyond a reasonable doubt that he was guilty of unlawful possession of a weapon by a felon because the only evidence against him was the recanted prior inconsistent statements of Cooper, which lacked credibility.

¶ 39    The standard of review on a challenge to the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard is applicable in all criminal cases whether the evidence is direct or circumstantial. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). When considering the sufficiency of the evidence, it is not the reviewing court's duty to retry the defendant or substitute its judgment for the trier of fact as to the issues of witness credibility and the weight to be given to each witness's testimony. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). A reviewing court will only reverse a criminal conviction when the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. *Id*. These standards apply to all evidence, including prior inconsistent statements. *People v. Williams*, 332 Ill. App. 3d 693, 696 (2002). "Prior inconsistent statements alone may be sufficient to support a conviction," and it is the duty of the trier of fact to resolve the conflicts in the statements and determine which is more credible. *Id*. at 696-97.

¶ 40    Here, defendant argues that the evidence presented was insufficient to establish his guilt because the jury considered Cooper's prior inconsistent out-of-court written statement and grand jury testimony. We initially note that this complained-of evidence, Cooper's prior-inconsistent

statements, was admitted as substantive evidence pursuant to section 115-10.1 of the Illinois Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2016)). This section allows a party to use a witness's prior inconsistent statement as substantive evidence if the statement:

> "[W]as made under oath at a trial, hearing, or other proceeding, or *** [the statement] narrates, describes, or explains an event or condition of which the witness had personal knowledge, and *** the statement is proved to have been written or signed by the witness."
> *Id*. § § (a)(1), (a)(2)(A).

Here, defendant did not object at trial to the admission of this evidence and does not challenged its admission on appeal. Instead, defendant maintains that these prior-inconsistent statements lacked reliability because Cooper recanted her written statement and grand jury testimony at trial, there was no physical evidence or any other corroborating evidence, others testified that defendant was not involved and did not have a weapon, and defendant denied his involvement in the offense.

¶ 41 At trial, Cooper denied seeing defendant shoot anyone. However, Cooper's testimony was contrary to her signed statement and her testimony before the grand jury, in which she stated that she had witnessed defendant shoot the victim lying in the hallway. Further Cooper identified defendant in a photo lineup. This evidence was sufficient to convict defendant.

¶ 42 In *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999), the appellate court held that even where there is "no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction." In *Morrow*, the defendant was indicted for murder and armed robbery. *Morrow*, 303 Ill. App. 3d at 673. A witness implicated the defendant in a pretrial statement to detectives and an assistant state's attorney and in her testimony before the grand jury. *Morrow*, 303 Ill. App. 3d at

674. At trial, the witness recanted her pretrial statement and her grand jury testimony. *Morrow*, 303 Ill. App. 3d at 674-75. The jury convicted the defendant. The appellate court affirmed, holding:

> "[T]he previous inconsistent statements alone were sufficient to prove [the] defendant's guilt beyond a reasonable doubt. If a prior statement meets section 115-10.1's test, 'a finding of reliability and voluntariness is automatically made. *** Accordingly, no additional analysis is needed. ***[I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony.' *People v. Pursley*, 284 Ill. App. 3d 597, 609 (1996); see also *People v. Carlos*, 275 Ill. App. 3d 80, 84 (1995). 'Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may *not* engage in any such analysis.' (Emphasis in original). *People v. Curtis*, 296 Ill. App. 3d. [991] at 999 [(1998)]; [citations]." *Morrow*, 303 Ill. App. 3d at 677.

See also *People v. Logan*, 354 Ill. App. 3d 73, 79-80 (2004) (citing *Morrow* with approval and holding that convictions may be based solely upon prior inconsistent statements even where there is no corroborating evidence to support the conviction). In *People v. Zizzo*, 301 Ill. App. 3d 481 (1998), this court acknowledged that there are appellate court cases where recanted prior inconsistent statements were held not sufficient to sustain convictions. *Id*. at 486-89. However, we determined that these cases turned on their facts and that those cases did not establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction. *Id*. at 488-89. We explained in *Zizzo*:

"Thus, where a jury or trial court has convicted a defendant on the basis of a recanted prior inconsistent statement, the question for the reviewing court is not whether any evidence existed to corroborate the statement. [Citation.] Rather, the only inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 489.

¶ 43 In this case, the jury obviously found Cooper's pretrial written statement and grand jury testimony implicating defendant more credible than her trial testimony, and we will not substitute our judgment therefor. See *Logan*, 352 Ill. App. 3d at 80. Cooper's pretrial statement and grand jury testimony were sufficient to sustain defendant's conviction for unlawful use of a weapon by a felon. She stated in her written signed statement that "a guy in a yellow, burgundy, and black sweater fired two shots toward the guy in the black t-shirt." Cooper also wrote that the shooter wore a "yellow, burgundy and black hat [with] horizontal stripes." Cooper saw a black gun in his hand, "possibly a Glock 9 mm." Cooper's grand jury testimony was consistent with her written statement. A photo taken of defendant on the morning of the shooting shows him wearing the clothes described by Cooper.

¶ 44 Other evidence also supports defendant's conviction, as Cooper identified defendant in a photo lineup. Also, the details that Cooper provided were substantiated by the evidence, namely, the clothes defendant wore as described by Perez, and Breedlove's testimony of the loud commotion in the hallway near Cooper's room and of his hearing multiple gunshots. Finally, Cooper's description of the gun she saw in defendant's hand as a black 9 mm. firearm was consistent with the 9 mm. caliber shell casings found at the scene that were not attributable to the Kel-Tec firearm. Thus, Cooper's pretrial written statement and grand jury testimony were sufficient to sustain defendant's conviction for unlawful possession of a weapon by a felon.

¶ 45    Further, Cooper's trial court testimony disavowing the statements was presented to the jury and fully explored during trial. Given its verdict, the jury resolved these inconsistencies in favor of the State and determined that Cooper was telling the truth when she made her prior statements to police and the grand jury. See *Morrow*, 303 Ill. App. 3d at 677; *People v. McBounds*, 182 Ill. App. 3d 1002, 1014 (1989) (the trial court found witnesses' prior inconsistent statements more trustworthy than their trial testimony); *Zizzo*, 301 Ill. App. 3d 481 (a reviewing court may presume from the jury's verdict that it found a witness's prior inconsistent statement more trustworthy than his trial testimony). Given this record, defendant's argument is essentially asking this court to substitute its judgment for that of the trier of fact on matters involving the weight to be assigned the evidence and the credibility of the witnesses. As mentioned, this we cannot do.

¶ 46    Defendant relies on three cases to support his contention that his conviction cannot be sustained by a disavowed witness statement and the lack of corroborative evidence: *People v. Brown*, 303 Ill. App. 3d 949 (1999), *People v. Reyes*, 265 Ill. App. 3d 985 (1993), and *People v. Parker*, 234 Ill. App. 3d 273 (1992). However, each of these cases was decided under its particular facts and circumstances; they do not establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction. See *Zizzo*, 301 Ill. App. 3d 481, 488-89.

¶ 47    In *Brown*, the only evidence against the defendant was the disavowed prior statement of a witness who told police that he saw the defendant shoot and kill the victim. *Brown*, 303 Ill. App. 3d at 965. The appellate court reversed the defendant's murder conviction, noting that the witness's first statement implicating the defendant was not made until nearly two years after the crime occurred when the witness was in custody and afraid that he would be charged with a drug offense. *Id.* The appellate court stated that where the witness's prior statements "were not made contemporaneously with the victim's shooting and lacked corroborative evidence," the evidence

was insufficient to prove the defendant guilty beyond a reasonable doubt. *Id*. In this case, Cooper provided her written statement within hours of the crime and while under no threat of being charged with a crime. Further, Cooper testified before the grand jury less than one month after the crime, and her grand jury testimony was consistent with her written statement. Therefore, *Brown* is distinguishable from this case.

¶ 48    In *Reyes*, the appellate court held the State had not proven the defendant guilty beyond a reasonable doubt of attempted murder, where the only evidence to contradict the defendant's testimony that he had not participated in the group beating was two witnesses' grand jury statements. *Reyes*, 265 Ill. App. 3d at 989. The court deemed the credibility of those statements to be highly suspect because: (1) both witnesses recanted during the defendant's trial; (2) both statements consisted merely of "yes" and "no" answers to leading questions from the State; and (3) one of the witnesses testified, without contradiction, that the police had coerced her into identifying the defendant. *Id*. at 989. Because the disavowed and highly suspect grand jury statements were the sole evidence of the defendant's guilt, the court held that the State failed to prove the defendant guilty beyond a reasonable doubt. *Id*. at 990. Here, Cooper's grand jury testimony was the result of open-ended questions that resulted in her detailed descriptions of the events at the time of the shooting. Also, Cooper's written statement was not coerced, rather, it was voluntarily given and she picked defendant's photo from a lineup. For these reasons, *Reyes* is distinguishable from this case.

¶ 49    In *Parker*, the defendant was convicted of murder, armed violence, attempted murder, and aggravated battery based on the prior inconsistent statements of three witnesses. *Parker*, 234 Ill. App. 3d at 274. The first witness, a surviving victim of the shooting, denied giving the first statement to police identifying the defendant as the man who shot him, explaining that the

statement was taken only seven days after his surgery when he was still recovering and in great pain. *Id*. at 276. He admitted he signed the statement without reading it, because he wanted the detectives to leave his hospital room. *Id*. The second witness testified that he gave his statement identifying the defendant as the shooter because the detective came to his home with a prepared statement and told him that if he did not sign it, he would be arrested for withholding information "'because somebody put me at the scene of the crime.'" *Id*. at 277. The second witness was only 17 years old, had just been released from the juvenile department of corrections, and was frightened by the detective's threat. *Id*. The third witness testified that he told police that he saw the defendant with a gun earlier prior to the murder because the police had beaten him and forced him to sign the statement. *Id*. at 278. The appellate court determined that the three prior statements "were severely impeached by the witnesses' trial testimony, which exculpated defendant and cast doubt on the authenticity of the statements.'" *Id*. at 280. The court explained that the "lack of credible eyewitness testimony * * * combined with the complete absence of any physical evidence tying defendant to the crime" prompted it to find that the evidence was insufficient to sustain the defendant's convictions. *Id*. at 280. In this case, there was no claim that the detectives coerced or forced Cooper into signing her statement or forced her into testifying before the grand jury. Thus, *Parker* is distinguishable from this case.

¶ 50                                  B. Sentencing

¶ 51    Next, defendant argues that his maximum term, ten-year sentence for unlawful use of a weapon by a felon was excessive, because he did not have a violent criminal background, the jury found him not guilty of counts 1-38, and the court relied on the need to deter others as a factor in aggravation, which is a factor applicable to all weapons charges.

¶ 52    The trial court has broad discretion in imposing a sentence, and its sentencing decisions are afforded great deference because the trial judge "observed the defendant and the proceedings and is in a better position to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). The reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." (Internal quotation marks omitted.) *Id*. at 213. However, we must interpret sentencing laws "in accord with common sense and reason" and not merely rubber-stamp the trial court's judgment, so as to "avoid an absurd or unduly harsh sentence." *People v. Allen*, 2017 IL App (1st) 151540, ¶ 1.

¶ 53    In reviewing a defendant's sentence, we must defer to the trial court, which is uniquely qualified to weigh the pertinent sentencing factors. *Stacey*, 193 Ill. 2d at 209. We will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. We will not alter a defendant's sentence unless the trial court abused its discretion. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50. A sentence that falls within the statutory range is presumed to be proper and "'will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.'" *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). See also *Stacey*, 193 Ill. 2d at 210 (stating that a sentence is not an abuse of discretion unless it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense).

¶ 54    A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. To that end, the trial court must consider all statutory factors in aggravation and mitigation. *Id.*; 730 ILCS 5/5-5-3.1 (West 2018); *Id*. § 5-5-3.2. The trial court is presumed to consider "all relevant factors and any mitigating evidence presented" but has no obligation to recite and assign a value to each factor. *Williams*, 2019 IL App (1st) 173131, ¶ 21. The defendant bears the burden of making an affirmative showing that the sentencing court did not consider the relevant factors. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 14. For the following reasons, we determine defendant has failed to meet that burden here.

¶ 55    Defendant was convicted of unlawful possession of a weapon by a felon, a Class 3 felony (720 ILCS 5/24-1.1 (West 2016)) with a sentencing range of not less than 2 years and not more than 10 years (*Id*. § 24-1.1(e)). Defendant's sentence was within the statutory range; thus, we presume it was proper. *Williams*, 2016 IL App (1st) 141063, ¶ 22.

¶ 56    We hold that the trial court did not abuse its discretion in sentencing defendant to 10 years in prison. The record shows that the trial court considered all the appropriate factors in aggravation and mitigation. At the sentencing hearing, the trial judge stated that it considered the presentence investigation reports, arguments of counsel, and all statutory and relevant non-statutory factors in aggravation and mitigation. The court found no statutory mitigating factors but found non-statutory mitigating factors, including defendant's history of family substance abuse, family histories of criminality, and defendant's history of substance abuse and his ninth-grade education. The court found three statutory aggravating factors: (1) that defendant's conduct threatened serious harm, (2) that defendant had a history of prior delinquency and criminal activity, and (3) that the sentence was necessary to deter others from committing the same crime. These were proper factors to

consider. See 730 ILCS 5/5-5-3.2(a)(1); *id*. § 5-5-3.2(a)(3); *id*. § 5-5-3.2(a)(7). The court found that it was likely defendant would commit similar offenses in the future, based on his multiple juvenile delinquency adjudications and felony convictions.

¶ 57    The court detailed defendant's substantial criminal record, beginning with his multiple adjudications of delinquency dating back to 1998. As an adult, the court found that defendant "continued an ongoing pattern of criminality and convictions for various crimes." The court's finding was supported by the record, which indicated four felonies including convictions for dealing a firearm without a license, possession of a firearm without a firearm owner's identification (FOID) card, and two convictions for possession with intent to deliver cannabis. Defendant served five years in prison for the firearms convictions.

¶ 58    Defendant, however, asserts that his offense is really a misdemeanor enhanced by a nonviolent felony offense. Defendant argues his sentence should be reduced because the nature of his offense was nonviolent. We disagree with defendant and determine that the possession of a loaded firearm by a felon poses a danger to society, especially during a crowded New Year's party at a hotel. In further support of its decision, the trial court relied on defendant's contribution to the dangers of gun violence and the proliferation of illegal guns in the community. The court cited a compelling need to deter "the wrong people" from "arming themselves." Therefore, given the present crime, defendant's criminal history, his lack of contribution to society, and the need to deter others, we cannot say that the court abused its discretion by sentencing defendant to 10 years' imprisonment in this case. The trial court properly determined that a significant term of imprisonment is "necessary for the protection of the public."

¶ 59                                        III. CONCLUSION

¶ 60    The judgment of the circuit court of Winnebago County is affirmed.

¶ 61    Affirmed.